21 CV 07534

JUDGE KOELTL

**Redacted Complaint**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAREPTA THERAPEUTICS, INC.; ST INTERNATIONAL HOLDINGS TWO, INC. | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| BIOMARIN LEIDEN HOLDING BV; BIOMARIN NEDERLANDS BV; BIOMARIN TECHNOLOGIES BV | |
| Defendants. | |

2021 SEP -9
U.S. DISTRICT COURT
S.D. OF N.Y.

## COMPLAINT

Plaintiffs Sarepta Therapeutics, Inc. and ST International Holdings Two, Inc. (collectively "Sarepta"), by its undersigned counsel, bring this action for declaratory and monetary relief against BioMarin Leiden Holding BV and its subsidiaries, BioMarin Nederlands BV and BioMarin Technologies BV (collectively, "BioMarin" or "Defendant"), alleging as follows:

## INTRODUCTION

1.     This action arises out of a license agreement executed by Sarepta and BioMarin on July 17, 2017 (as amended on April 14, 2019 (the "Agreement") in concert with a settlement agreement between Sarepta and BioMarin executed that same day (the "Settlement Agreement"). At the heart of the Agreement is an exclusive patent license from BioMarin to Sarepta. Under this provision, BioMarin granted Sarepta an exclusive patent license to research, develop, and, *inter alia*, sell certain pharmaceutical products, and unless BioMarin exercises an option to proceed with a co-exclusive license, the license is exclusive *even as to BioMarin*.

2.      If BioMarin exercises the co-exclusive license option, however, the royalties and other payments Sarepta makes to BioMarin are significantly reduced or eliminated.

3.      BioMarin recently announced that it is developing a product that falls under the terms of the exclusive license, and which BioMarin is currently precluded from researching and developing.  Despite the express language of the Agreement's key provisions, however, BioMarin has refused to exercise its co-exclusive license option.

4.      Accordingly, by practicing the exclusively licensed patent rights without exercising its co-exclusive license option, BioMarin has breached—and continues to breach—its fundamental obligations under the Agreement.

5.      The Agreement specifically concerns products for Duchenne muscular dystrophy ("DMD"), a rare, invariably fatal genetic disease characterized by progressive muscle degeneration. Symptoms of DMD typically onset in early childhood and result in the use of a wheelchair during the teenage years.  While historically those with DMD did not survive long beyond their teenage years, recent medical advances have extended the life expectancy for many with DMD into their 30s or later.  These advances include three Sarepta products subject to the Agreement that have received regulatory approval for the treatment of DMD: Exondys 51®(eteplirsen), Vyondys 53®(golodirsen), and Amondys 45®(casimersen).

6.      DMD is caused by a change or genetic mutation in an exon—a portion of a gene that codes for a protein—of the dystrophin gene. When functioning normally, this gene produces the dystrophin protein, which plays a key role in muscle fiber function.  But a change or mutation causes a shift during the building process that prevents the cell from synthesizing a fully functional protein. Accordingly, patients with DMD produce little or no dystrophin in their muscles.  Without this protein, normal activity causes excessive damage to muscle cells and leads to a progressive

loss of function.  Exon skipping therapies treat DMD by correcting for specific genetic mutations, causing the cellular machinery to "skip" over an exon when processing the instructions for building dystrophin, enabling the patient's cells to make a functional—though shorter—form of the protein.

7.      The Agreement relates to exon skipping technology for the treatment of DMD.  In particular, the Agreement covers pharmaceutical products that include molecules called antisense oligonucleotides ("AONs"), or modified forms thereof, that induce exon skipping as an active ingredient.  AONs are subject to a multitude of possible chemical modifications in the development of pharmaceutical treatments.

8.      Sarepta and BioMarin (including its predecessor Prosensa Holding B.V.) both had a long history of being involved in independent exon skipping research and development efforts for the treatment of DMD.  Over a year before the Agreement, however, BioMarin announced that it had discontinued clinical and regulatory development of all four of its exon skipping therapies for DMD.  Sarepta, on the other hand, received FDA approval for its first exon skipping therapy for DMD about ten months before the Agreement and had at the time additional exon skipping therapies in clinical development.  Sarepta and BioMarin were engaged in various related intellectual property disputes for almost a decade up until the time of the Agreement.

9.      As part of an effort to resolve these disputes, the Agreement struck a simple bargain.  BioMarin agreed that it would grant Sarepta an exclusive license, even as to BioMarin, to any patents (or patent applications) that are (or would be) useful to research or develop "any and all pharmaceutical products comprising as an active pharmaceutical ingredient an antisense oligonucleotide or modified form thereof that targets one or more exons of the dystrophin gene to induce exon skipping and is potentially useful for the treatment of muscular dystrophy."

10.     In exchange, Sarepta made a series of significant financial commitments, including an initial payment of $15 million, various development milestones, a sales milestone, and an agreement to pay royalty rates of 5% of domestic net sales and 8% of international net sales on its first three products.

11.     Importantly, the Agreement does not permanently exclude BioMarin from researching and developing exon skipping products to treat DMD.  Rather, should BioMarin wish to reenter this space and practice the exclusively licensed patents, all it must do is exercise the Agreement's co-exclusive license option.  *Once BioMarin exercises this option, however, the royalties Sarepta pays to BioMarin are significantly reduced and the milestone payments are potentially eliminated*.

12.     For four years, BioMarin has never exercised the co-exclusive license option, such that, as set forth in the Agreement, Sarepta has been performing as the exclusive licensee by paying the higher set of royalty rates.  To date, Sarepta has paid ████████████ in royalties under the Agreement.  In addition, Sarepta has paid a total of $20 million in development milestones upon the FDA approval of its second and third exon skipping therapies, Vyondys 53®(golodirsen) and Amondys 45®(casimersen), respectively, under the terms of the exclusive license.

13.     In early 2021, BioMarin publicly disclosed that it is researching and developing a product called BMN 351, which it described as an "antisense oligonucleotide therapy" intended "for the treatment of Duchenne Muscular Dystrophy."

14.     The terms of the Agreement's exclusive license extend to products like BMN 351. Indeed, the joint press release attached to the Agreement, and issued after the Agreement was executed, stated that: "Sarepta and BioMarin executed a license agreement that provides Sarepta Therapeutics with global exclusive rights to BioMarin's DMD patent estate for EXONDYS 51 and

*all future exon-skipping products*.  BioMarin retains the right to convert the license to a co-exclusive right *in the event it decides to proceed with an exon-skipping therapy for DMD*." (emphasis added).

15.      BioMarin never informed Sarepta of its post-Agreement research and development activities of antisense oligonucleotide therapies for the treatment of DMD.  Instead, BioMarin remained silent and now refuses to exercise its co-exclusive option under the Agreement.  Further, on information and belief, BioMarin has been conducting this research and development for some time, all the while receiving the higher royalty rates provided for under the Agreement and development milestone payments that otherwise would not have been paid.

16.      After coming across BioMarin's early 2021 disclosure, Sarepta raised this issue in a March 10, 2021 phone call with BioMarin affiliate BioMarin Pharmaceutical Inc.'s ("BioMarin Inc.") Group Vice President of Intellectual Property, Luisa Bigornia; during a follow-up phone call on April 9, 2021, BioMarin implausibly suggested that its work on BMN 351—a breach of *contract*—was protected by a statutory defense to *patent infringement* colloquially referred to as the "safe harbor."

17.      Not satisfied with the initial response by BioMarin, Sarepta raised this issue again in a June 29, 2021 phone call with BioMarin Inc.'s Executive Vice President, General Counsel and Secretary, G. Eric Davis; again, BioMarin stood behind the Safe Harbor as a theory to excuse its breach of contract.

18.      Sarepta's counsel subsequently outlined its position that BioMarin was in breach of the Agreement in a July 2, 2021 letter to BioMarin and requested a response by July 30, 2021.

19.    Counsel for BioMarin responded on August 18, 2021, doubling down on the argument that the federal research safe harbor of 35 U.S.C. § 271(e)(1) excuses BioMarin from the explicit provisions of the Agreement.

20.    Sarepta's counsel sent counsel for BioMarin a letter rebutting those assertions, and providing formal notice of a breach pursuant to the Agreement on September 7, 2021.

21.    BioMarin has not made any allegation that Sarepta has failed to uphold its end of the Agreement.  BioMarin exercised its audit rights under the Agreement  during March 2021 and concluded the audit process at the end of April 2021.  BioMarin has not informed Sarepta of any non-compliance with its financial obligations.

22.    The Agreement is governed by New York law and provides for exclusive jurisdiction in this Court or the state courts of New York.

23.    Sarepta has been, and will continue to be, harmed by BioMarin's breach of its fundamental obligation under the Agreement.  By this Complaint, Sarepta now seeks a declaratory judgment that (1) BioMarin's work, including research and development, on BMN 351 (and any other antisense oligonucleotide therapy for the treatment of DMD)  and failure to timely exercise the co-exclusive license option violates the Agreement; (2) Going forward, Sarepta owes only the royalties and milestone payments due under the co-exclusivity provision of the Agreement; (3) BioMarin's work on BMN 351 (and any other antisense oligonucleotide therapy for the treatment of DMD), and failure to timely exercise the co-exclusive license option is a material breach of the Agreement; and (4) Should BioMarin fail to cure its material breach within the Agreement's prescribed cure period, Sarepta will be entitled to terminate the Agreement for cause, after which the licenses granted by BioMarin to Sarepta will become royalty-free, provided that Sarepta complies with any financial obligations accrued prior to the termination date.  Additionally,

Sarepta seeks monetary damages in the amount of royalty and milestone payments that Sarepta has unknowingly overpaid, or paid under protest, since BioMarin began post-Agreement work on BMN 351 (or any other antisense oligonucleotide therapy for the treatment of DMD).

## THE PARTIES

24.     Plaintiff Sarepta Therapeutics, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business at 215 First Street, Cambridge, MA 02142.

25.     Plaintiff ST International Holdings Two, Inc., the successor entity to Sarepta International C.V., is a corporation organized and existing under the laws of Delaware with its principal place of business at 215 First Street, Cambridge, MA 02142.

26.     On information and belief, Defendant BioMarin Leiden Holding BV is a Dutch company with its principal place of business at Barbara Strozzilaan 201, Amsterdam, 1083HN.

27.     On information and belief, Defendant BioMarin Nederlands BV is a subsidiary of BioMarin Leiden Holding BV and a Dutch company with its principal place of business at J.H. Oortweg 21, 2333 CH Leiden, Netherlands.

28.     On information and belief, Defendant BioMarin Technologies BV is a subsidiary of BioMarin Leiden Holding BV and a Dutch company with its principal place of business at J.H. Oortweg 21, 2333 CH Leiden, Netherlands.

## JURISDICTION AND VENUE

29.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because this action is between citizens of a state and citizens of a foreign state,

respectively, such that complete diversity of citizenship between the Parties exists, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

30.    This Court has authority to grant declaratory relief pursuant to Federal Rule of Civil Procedure 57 and the Declaratory Judgment Act, § 28 U.S.C. 2201 et seq.

31.    Defendants are subject to the Court's personal jurisdiction, consistent with principles of due process and the New York Long Arm Statute, N.Y. C.P.L.R. § 302(a)(1), because Defendants voluntarily entered into the binding Agreement under which each party "irrevocably submits to the exclusive jurisdiction of the state courts of the State of New York or the United States District Court for the Southern District of New York for the purpose of any and all actions, suits or proceedings arising in whole or in part out of, related to, based upon or in connection with this Agreement" and "waives to the extent not prohibited by Applicable Law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts. . . ."

32.    Venue is also proper in the Southern District of New York because the Parties agreed to "the exclusive jurisdiction of the state courts of the State of New York or the United States District Court for the Southern District of New York" and "agree[d] not to commence any such action other than before one of the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action to any court other than one of the above-named courts whether on the grounds of inconvenient forum or otherwise."

## STATEMENT OF FACTS

**I.    The Agreement**

33.    Sarepta and BioMarin executed the Agreement on July 17, 2017.  A true and accurate copy of the Agreement is attached to the Complaint as **Exhibit 1**.  Sarepta and BioMarin

amended the Agreement on April 14, 2019 (the "Amendment"). A true and accurate copy of the Amendment is attached to the Complaint as **Exhibit 2**. Under the Amendment, plaintiff ST International Holdings Two, Inc. assumed the rights and obligations of Sarepta International C.V. under the Agreement.

34.    At the heart of the Agreement are two provisions: the "License Grant" and the "Co-Exclusive License Option."

35.    Under the License Grant in Section 2.1 of the Agreement, discussed in detail below, BioMarin provided Sarepta an exclusive patent license to research, develop, and, *inter alia*, sell any and all products containing AONs that induce exon skipping and are potentially useful for the treatment of muscular dystrophy, which license was expressly exclusive "even as to BioMarin." Furthermore, in Section 9.2(h) of the Agreement, BioMarin covenanted that "BioMarin and its Affiliates will not use or exploit any of the Licensed Patents or Licensed Know-How in any manner that is inconsistent with or otherwise diminishes the licenses granted to Sarepta hereunder or diminishes the value of any Licensed Patent or Licensed Know-How."

36.    Critically, although the License Grant is exclusive even with respect to BioMarin, under the Co-Exclusive License Option in Section 2.4 of the Agreement, "BioMarin will have the option to convert" the exclusive portion of the License Grant "into a co-exclusive license [with Sarepta]."

37.    In exchange for the exclusive License Grant—and the promise that the license would remain exclusive, even as to BioMarin, unless BioMarin exercised the Co-Exclusive License Option—Sarepta decided to enter into the Settlement Agreement and License Agreement, agreed to several significant financial commitments to BioMarin, and has since the Agreement date made several payments to BioMarin on the premise of the license being exclusive.

38.    First, as set forth in Section 4.1 of the Agreement, Sarepta agreed to pay BioMarin a non-refundable, non-creditable $15 million payment within ten business days of the effective date of the Agreement.  Sarepta made this $15 million payment to BioMarin on July 31, 2017.  As set forth in Section 5.1 of the Settlement Agreement, Sarepta also paid BioMarin an additional $20 million on July 31, 2017.

39.    Second, under Section 4.2 of the Agreement, Sarepta agreed to make certain "Development Milestone Payments" upon the exon skipping products covered by the Agreement (the "Royalty Bearing Products") achieving certain regulatory benchmarks.  As of the filing date, Sarepta has paid $20 million in Development Milestone Payments.

40.    Third, under Section 4.3 of the Agreement, Sarepta agreed to make a one-time "Sales Milestone Payment" of $15,000,000 after the first calendar year in which aggregate net sales of the Royalty Bearing Products exceed $650,000,000.  The Sales Milestone Payment has not been achieved as of the date of this Complaint.

41.    Fourth, Sarepta agreed to make royalty payments to BioMarin based on the sale of the Royalty Bearing Products.  Section 4.4.1 sets forth two payment tiers:

- If BioMarin **has not** exercised the Co-Exclusive License Option, Sarepta pays BioMarin 5% royalties on its net sales of Royalty Bearing Products in the United States, and 8% royalties on its set sales of Royalty Bearing Products outside the United States.
- If BioMarin **has** exercised the Co-Exclusive License Option, Sarepta pays BioMarin 4% royalties on its net sales of Royalty Bearing Products in the United States, and 5% royalties on its net sales of Royalty Bearing Products outside the United States.

Thus, Sarepta pays 25% higher domestic royalties and 60% higher foreign royalties when the Co-Exclusive License Option remains unexercised.

42.    Under Section 1.78 of the Agreement, which sets forth the applicable "Royalty Term" for which Sarepta must pay royalties on each product in each country, the Royalty Terms

for "Lead Products" (Exon 45 Skipping Products, Exon 51 Skipping Products, and Exon 53 Skipping Products) extend no later than the end of 2024.[1]  For other products subject to the Agreement, called "Follow-On Products," the Royalty Terms continue until "the date the relevant Follow-On Product is no longer Covered by a Licensed Patent in the applicable country."[2]

43.    Under the exclusive license, Lead Products are "Royalty Bearing Products" irrespective of whether they are "Covered" (as defined in Section 1.27 of the Agreement) by a Licensed Patent.  If the Co-Exclusive License Option is exercised, however, the definition of Royalty Bearing Products changes per Section 2.4.2 such that Lead Products are Royalty Bearing Products only if they are Covered by a Licensed Patent.



44.    Under Section 11.1 of the Agreement, unless terminated for cause or a patent challenge, the "Term" of the Agreement "will expire upon the last-to-expire Royalty Term."

## II.    BioMarin's Breach of the Agreement

45.    Despite the Agreement's central tenet—BioMarin cannot research or develop products containing AONs that induce exon skipping and are potentially useful for the treatment of DMD unless it exercises the Co-Exclusive Option—BioMarin has done just that.

---

[1] Section 1.78 as amended specifies that the Royalty Term for Lead Products will end on March 31, 2024 in the United States, December 31, 2024 in the European Union, and, depending on patent coverage, no later than December 31, 2024 in other countries.

[2] If BioMarin exercises the Co-Exclusive License Option, the definition of Royalty Term is modified such that the Royalty Term for each Lead Product and Follow-On Product ends as early as when such Royalty Bearing Product is no longer Covered by a Licensed Patent in the applicable country and extends no later than March 31, 2024 in the United States and December 31, 2024 in all other countries.

46.     On information and belief, in a poster presented at the World Muscle Society 2020 Virtual Congress taking place between September 30 and October 2, 2020, BioMarin disclosed that it was researching two novel exon 51-skipping AONs for the treatment of DMD. In this presentation, it disclosed that it had conducted multiple studies investigating whether injections of these exon-skipping AONs in mice increased dystrophin production.  A true and accurate copy of the World Muscle Society Programme page listing this presentation, which was titled "Characterization of Novel Exon-51 Skipping Oligonucleotides that Safely Rescues Dystrophin Expression in a Severe Model of Duchenne Muscular Dystrophy," is attached to the Complaint as **Exhibit 3**.

47.     In a presentation at the J.P. Morgan Healthcare Conference on January 11, 2021, BioMarin disclosed that its oligonucleotide BMN 351 was in Investigational New Drug ("IND") enabling studies. A true and accurate copy of the relevant slides from that presentation is attached to the Complaint as **Exhibit 4**.

48.     On February 26, 2021, BioMarin Pharmaceutical Inc., an "Affiliate" of BioMarin as defined in Section 1.2 of the Agreement, filed its annual report "10-K" with the US Securities and Exchange Commission ("SEC"), in which it disclosed that "IND-enabling studies are underway for BMN 351, an oligonucleotide therapy that has demonstrated a high-level of protein expression in pre-clinical models for the treatment of Duchenne Muscular Dystrophy" and that BioMarin Inc. "intend[s] to determine the timing of a potential IND filing at the end of the year based on the results of these studies."[3]  A true and accurate excerpt of the quoted portion of this filing attached to the Complaint as **Exhibit 5**.[4]

---

[4] The full February 26, 2021 10-K filed by BioMarin Pharmaceutical Inc. is publicly available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001048477/000104847721000008/bmrn-20201231.htm.

49.    A short time later, BioMarin Inc.'s April 30, 2021 quarterly report "10-Q" filed with the SEC reported as follows:

> IND-enabling studies are underway for BMN 351 for the treatment of Duchenne Muscular Dystrophy (DMD).    BMN 351 is an antisense oligonucleotide therapy that has demonstrated dystrophin expression levels of 30-50% of wild-type levels in the quadriceps in a DMD mouse model treated at 18.7 mg/kg/week for 13 weeks (measured 2 weeks following latest administration).    If results from the ongoing pre-clinical studies are supportive, we anticipate filing an IND in the first half of 2022.

A true and accurate excerpt of the quoted portion of this filing attached to the Complaint as **Exhibit 6**.[5]

50.    BioMarin's and its Affiliate's work on BMN 351 is incompatible with the express terms of the Agreement.

51.    Section 2.1 of the Agreement grants Sarepta an exclusive license under the "Licensed Patents"—even as to BioMarin—to research, develop, and sell "Products."    In full, Section 2.1 states:

> BioMarin hereby grants to Sarepta a license with the right to grant Sublicenses (as provided in Section 2.2 (Right to Sublicense)) under the Licensed IP to *research, develop*, make, have made, use, sell, offer for sale, have sold, import and export Products, *or otherwise practice and exploit* the Licensed IP, in the Territory in all fields of use and for all purposes during the Term (the "**Sarepta License**"), which license is (a) non-exclusive, with respect to the Licensed Know-How and (b) *exclusive*, with respect to all Licensed Patents. *Subject to Section 2.4 (BioMarin Co-Exclusive License Option)*, the foregoing license under clause 2.1(b) is *exclusive even as to BioMarin*.    For clarity, pursuant to the Sarepta License, Sarepta may use the Licensed Know-How for any purpose relating to Products, including in regulatory submissions relating to Products (emphasis added).

---

[5] The full April 30, 2021 10-Q filed by BioMarin Pharmaceutical Inc. is publicly available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001048477/000104847721000016/bmrn-20210331.htm.

52.    In Section 9.2(h) of the Agreement, BioMarin also covenants that it and its Affiliates "will not use or exploit" any of the Licensed Patents "in any manner that is inconsistent with or otherwise diminishes the licenses granted to Sarepta hereunder or diminishes the value of any Licensed Patent . . . ."  BioMarin's development of a competing product with and through its Affiliate is clearly inconsistent with the exclusive license granted to Sarepta (which was expressly exclusive "even as to BioMarin") and diminishes the value of the exclusive license.

53.    Under Section 1.69, "Products" is defined as "*any and all* pharmaceutical products comprising as an active pharmaceutical ingredient an antisense oligonucleotide or modified form thereof that targets one or more exons of the dystrophin gene to induce exon skipping and is potentially useful for the treatment of muscular dystrophy" (emphasis added).

54.    Under this definition, BMN 351 is a Product.  Indeed, BioMarin's April 30, 2021 10-Q explicitly describes BMN 351 as an "antisense oligonucleotide therapy" "for the treatment of Duchenne Muscular Dystrophy."  Likewise, in a "Message from the Chairman and CEO" connected to BioMarin's 2021 Proxy Statement, BioMarin described BMN 351 as an "oligonucleotide therapy for the treatment of Duchenne Muscular Dystrophy."

55.    Under Section 1.55 of the Agreement, "Licensed IP" means the "Licensed Patents and Licensed Know-How."  And under Section 1.57, "Licensed Patents" is defined as "all Patents . . . that are Controlled by BioMarin . . . *at any time during the Term* that are necessary or useful (or, with respect to patent applications, would be necessary or useful if such patent applications were to issue as patents) to research, develop, make, have made, use, sell, offer for sale, have sold, import or export any Product in the Territory." (emphasis added).  Under Section 11.1, the Term of the Agreement expires when the last to expire Royalty Term ends, and as each

Royalty Term expires in each country, Sarepta's license becomes royalty-free and fully paid in that country.

56.    On information and belief, BioMarin's and its Affiliate's work on BMN 351 entails practicing Licensed Patents.  Per Sections 1.65 and 1.57 of the Agreement, the definition of Licensed Patents includes patent applications, and, on information and belief, BioMarin's BMN 351 research has already resulted in the filing of at least one patent application covering it; that application is itself now a Licensed Patent.  Indeed, Sarepta has identified at least three (previously unknown to it) BioMarin patent applications that appear to fall within the scope of the Licensed Patents—including two filed after the execution of the Agreement.[6]

57.    Thus, through its and its Affiliate's work on BMN 351 (and potentially other compounds), BioMarin is practicing Licensed Patents to research and develop a Product.  This is precisely what the plain language of the License Grant in Section 2.1 and the covenant in Section 9.2(h) prohibits BioMarin from doing.  BioMarin granted Sarepta an exclusive License to practice the Licensed Patents, and the definition of Licensed Patents makes clear that it covers patents and patent applications whenever filed, including those filed subsequent to the signing of the Agreement.

58.    BioMarin's breach diminishes the value of the license granted to Sarepta because of (potential) competition from BioMarin.  This is especially egregious because such a scenario is quantifiable and explicitly addressed by the Agreement, which allows BioMarin to exercise the Co-Exclusive License Option in exchange for reduced royalties and potentially other payments. Under Section 2.4.1 of the Agreement:

---

[6] The PCT applications are PCT Pub. Nos. WO2018/007475 (filed July 5, 2017), WO2018/091544 (filed November 15, 2017), and WO2020/089325 (filed October 30, 2019).  For all three of these PCT applications, Defendant BioMarin Technologies BV is named as the applicant.

> During the Term, BioMarin will have the option to convert clause (b) of the Sarepta License into a co-exclusive license (with BioMarin) . . . . BioMarin may exercise the BioMarin Co-Exclusive License Option at any time during the Term by providing 60 days' prior notice thereof to Sarepta (the "BioMarin Option Notice").

59.     Under Section 2.4.2 of the Agreement, if BioMarin exercises the Co-Exclusive License Option, the definition of Royalty Bearing Products is narrowed, and the royalties that remain payable to BioMarin are decreased as set forth in Section 4.4.1.

60.     Thus, since the time that BioMarin began practicing a Licensed Patent to research and develop BMN 351 (or any other antisense oligonucleotide therapy for the treatment of DMD post-Agreement), Sarepta has unknowingly been paying—and BioMarin has *knowingly* accepted—significant royalty and milestone overpayments.    On information and belief, BioMarin's until-recently clandestine work on BMN 351 (and potentially other antisense oligonucleotide therapy for the treatment of DMD) has resulted in years of royalty and milestone overpayments by Sarepta.

## III.    BioMarin's Refusal to Cure its Breach

61.     On July 2, 2021, counsel for Sarepta wrote to BioMarin, noting that BioMarin was in breach of the Agreement, and requested that BioMarin abandon its research and development of BMN 351 or exercise the Co-Exclusive License Option.

62.     BioMarin refused.  In an August 18, 2021 letter, BioMarin claimed that, contrary to the express terms of the Agreement, BioMarin in fact did not grant Sarepta an exclusive right to research or develop Products under the Licensed Patents on the basis that it could not enforce patent rights against third parties in light of the "safe harbor."  To support this improbable contention, BioMarin cited the federal research safe harbor of 35 U.S.C. § 271(e)(1), but failed to explain how this provision—which merely restricts the definition of patent infringement in

certain cases—has any bearing on BioMarin's *contractual* promise not to research or develop Products under the Licensed Patents without exercising the Co-Exclusive License Option.

63.    As of the date of this filing, BioMarin has neither exercised the Co-Exclusive License Option nor indicated that it will cease its work on BMN 351.

64.    As of the date of this filing, BioMarin continues to assert, contrary to the express terms of the Agreement, that it is not obligated to exercise the Co-Exclusive License Option and that it is entitled to the higher royalty rates and milestone payments applicable when the Co-Exclusive License Option remains unexercised.

65.    Sarepta has been significantly damaged and will continue to be significantly damaged by BioMarin's actions in researching and developing BMN 351, which diminishes the license for which Sarepta bargained.

66.    BioMarin's actions constitute a material breach of the Agreement.  Sarepta provided BioMarin with formal notice of breach on September 7, 2021, and under Section 11.2 of the Agreement, should BioMarin fail to cure its breach within the prescribed cure period, Sarepta will be entitled to terminate the Agreement for cause.  (The cure period is tolled during the pendency of this suit.)

67.    Under Section 11.4.3 of the Agreement, upon termination of the Agreement by Sarepta based on BioMarin's material breach, "the licenses granted by BioMarin to Sarepta under this Agreement will survive such termination," and Sarepta shall be entitled to use the licenses royalty-free.

## CLAIMS FOR RELIEF

### COUNT ONE:
### Declaratory Judgment (Breach of Contract)

68.    Sarepta repeats and realleges all the foregoing allegations in all of the preceding paragraphs of this Complaint as if they were set forth fully herein.

69.    As described above, Sarepta and BioMarin entered into the Agreement on July 17, 2017.

70.    The Agreement is a valid, binding, and enforceable contract.

71.    Sarepta performed all of its obligations under the Agreement.

72.    Pursuant to the terms of the Agreement, BioMarin granted Sarepta an exclusive license to practice the Licensed Patents to research or develop Products and covenanted that it would not use or exploit any of the Licensed Patents in any manner that is inconsistent with or otherwise diminishes the licenses granted to Sarepta.

73.    Should BioMarin wish to practice Licensed Patents to research or develop Products, it must exercise the Co-Exclusive License Option.

74.    BioMarin has not exercised the Co-Exclusive License Option.

75.    BioMarin's and its Affiliate's work on BMN 351 entails practicing Licensed Patent(s) to research or develop a Product.

76.     An actual and justiciable controversy exists between Sarepta and BioMarin regarding whether BioMarin's and its Affiliate's work on BMN 351 and failure to exercise the Co-Exclusive License Option is a breach of the Agreement and, consequently, whether Sarepta must continue paying the ongoing royalties and development payments due when the Co-Exclusive License Option has not been exercised.

77.    Pursuant to 28 U.S.C. § 2201, Sarepta is entitled to the following declarations:

    i.  BioMarin's and its Affiliate's work on BMN 351 and failure to exercise the Co-Exclusive License Option violates Sections 2.1 and 9.2(h) of the Agreement.

    ii.  For as long as the Agreement remains in force and BioMarin and its Affiliate continue work on BMN 351, Sarepta owes BioMarin only the royalties and development payments due under the Co-Exclusive License Option as set forth in Sections 2.4.2 and 4.4.1 of the Agreement, regardless of whether BioMarin has voluntarily exercised the Co-Exclusive License Option.

**COUNT TWO:**
**Declaratory Judgment (Material Breach of Contract)**

78. Plaintiff repeats and realleges all the foregoing allegations in all of the preceding paragraphs of this Complaint as if they were set forth fully herein.

79. As described above, Sarepta and BioMarin entered into the Agreement on July 17, 2017.

80. The Agreement is a valid, binding, and enforceable contract.

81. Sarepta performed all of its obligations under the Agreement.

82. Pursuant to the terms of the Agreement, BioMarin granted Sarepta an exclusive license to practice the Licensed Patents to research or develop Products.

83. Should BioMarin wish to practice Licensed Patents to research or develop Products, it must exercise the Co-Exclusive License Option.

84. BioMarin has not exercised the Co-Exclusive License Option.

85. BioMarin's and its Affiliate's work on BMN 351 entails practicing Licensed Patent(s) to research or develop a Product.

86.     Sarepta would not have entered into the Agreement had it known that BioMarin would practice Licensed Patents to research or develop Products without exercising the Co-Exclusive License Option.  BioMarin's actions defeat the purpose of the Agreement.

87.     Sarepta provided BioMarin with formal notice of BioMarin's breach of the Agreement on September 7, 2021.

88.     Should BioMarin fail to cure its breach within the cure period set forth in Section 11.2 of the Agreement , Sarepta will be entitled to terminate the Agreement for cause under Section 11.2 of the Agreement.  (The cure period is tolled during the pendency of this suit.)

89.     An actual and justiciable controversy exists between Sarepta and BioMarin regarding whether BioMarin has materially breached the Agreement and whether, should BioMarin fail to cure its material breach within the cure period, Sarepta will be entitled to terminate the Agreement for cause.

90.     Pursuant to 28 U.S.C. § 2201, Sarepta is entitled to the following declarations:

    i.      BioMarin's and its Affiliate's work on BMN 351 and failure to exercise the Co-Exclusive License is a material breach of the Agreement.

    ii.     Should BioMarin fail to cure its material breach within the cure period set forth in Section 11.2 of the Agreement, Sarepta will be entitled to terminate the Agreement for cause pursuant to Section 11.2 of the Agreement, after which Sarepta shall be entitled to use the licenses granted to it by BioMarin under the Agreement royalty-free, as provided in Section 11.4.3 of the Agreement.

## COUNT THREE:
### Breach of Contract (Damages)

91.     Plaintiff repeats and realleges all the foregoing allegations in all of the preceding paragraphs of this Complaint as if they were set forth fully herein.

92.    As described above, Sarepta and BioMarin entered into the Agreement on July 17, 2017.

93.    The Agreement is a valid, binding, and enforceable contract.

94.    Sarepta performed all of its obligations under the Agreement.

95.    Pursuant to the terms of the Agreement, BioMarin granted Sarepta an exclusive license to practice the Licensed Patents to research or develop Products.

96.    Should BioMarin wish to practice Licensed Patents to research or develop Products, it must exercise the Co-Exclusive License Option.

97.    BioMarin has not exercised the Co-Exclusive License Option.

98.    BioMarin's and its Affiliate's work on BMN 351 entails practicing Licensed Patent(s) to research or develop a Product.  Accordingly, BioMarin has breached the Agreement.

99.    As a direct and proximate result of BioMarin's breach of the Agreement, Sarepta has been damaged by unknowingly making significant royalty and milestone overpayments. Sarepta is entitled to damages in the amount of the difference between the royalties and milestones that Sarepta has paid since BioMarin first breached the Agreement and the amount of reduced royalties and milestones that Sarepta would have been required to pay had BioMarin properly and timely exercised the Co-Exclusive Option, including interest thereon, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Sarepta respectfully requests the following relief:

(1)    A declaratory judgment that BioMarin has breached Sections 2.1 and 9.2(h) of the Agreement;

(2)  A declaratory judgment that, for as long as the Agreement remains in force and BioMarin and its Affiliate continue work on BMN 351 (or any other antisense oligonucleotide therapy for the treatment of DMD), Sarepta owes BioMarin only the royalties and milestone payments due under the Co-Exclusive License Option as set forth in Sections 2.4.2, 4.2, 4.3 and 4.4.1 of the Agreement, regardless of whether BioMarin has voluntarily exercised the Co-Exclusive License Option.

(3)  A declaratory judgment that BioMarin has materially breached the Agreement.

(4)  A declaratory judgment should BioMarin fail to cure its material breach within the Agreement's prescribed cure period, Sarepta will be entitled to terminate the Agreement for cause pursuant to Section 11.2 of the Agreement, after which Sarepta shall be entitled to use the licenses granted to it by BioMarin under the Agreement royalty-free as provided in Section 11.4.3 of the Agreement.

(5)  Damages in the amount of the difference between the royalties and milestones that Sarepta has paid since BioMarin first breached the Agreement the amount of reduced royalties that Sarepta would have been required to pay had BioMarin properly and timely exercised the Co-Exclusive Option, including interest thereon;

(6)  Sarepta's reasonable costs and expenses in this action; and

(7)  Such other and further legal and equitable relief as to the Court may deem just and proper.

Dated: September 9, 2021

Filko Prugo
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036 (212)
596-9000
filko.prugo@ropesgray.com

*Attorney for Plaintiff Sarepta*